THE PEOPLE *ex rel.* Benjamin Bransom

*v.*

JOHN R. WALSH *et al.*

*Filed at Springfield September 30, 1880.*

1. STREETS—*control of, may be given to park commissioners.* It is competent for the legislature to transfer the control of the streets of a city or village to park commissioners, to be by them improved and controlled for boulevard and park purposes, where such purposes are not inconsistent with their use for ordinary travel.

2. SAME—*the fee is in the city for the public.* A city, as the agent or representative for the public, holds the fee of the streets therein for the use of the public,—not for the citizens of the city alone, but for the entire public, of which the legislature is the representative.

3. SAME—*legislative control.* So long as the use of streets is not exclusive, the mode of their exercise is within the control of the legislature. Embankments for railways, tunnels for crossing streets, notwithstanding they abridge the ordinary mode of uses, are within the power of the legislature to authorize.

4. SAME—*injury to private persons by change of use.* For any change of the use of a street dedicated to the public for ordinary purposes, since the adoption of our present constitution, to the extent that it damages private individuals, they will be entitled to recover. If they waive their rights, neither the public nor other persons can litigate for them. If the new use affects private rights, proceedings for condemnation may have to be invoked, but so far as affects the public alone, the legislature, as its representative, may do as it pleases.

5. Where no private rights are involved or invaded, the legislature may close a highway or street, or relinquish altogether its use by the public, or it may regulate its use or restrict it. In the absence of constitutional restriction, the legislature may vacate or discontinue a street or highway, or invest municipal corporations with this authority.

6. SAME—*grant of control with reservation.* Where a city is authorized by statute to grant the control of certain streets to park commissioners or not, at its pleasure, it may grant such control with reservations as to the laying of gas and water pipes and the construction of sewers, and such reservations will not invalidate the grant, but it must be taken subject to the reservations and conditions imposed, if accepted.

7. FORMER DECISION. The ruling in *Kreigh* v. *Chicago*, 86 Ill. 407, that the city of Chicago had no power to alienate the control of its streets to the park commissioners, and that the act relating to parks had no reference to prior

established streets, was under the statute as it then existed. Since then the needed legislation has been supplied, and that case is no longer binding.

8. PRESUMPTION—*that public officers will act according to law.* It will be presumed that public officers, such as park commissioners, will, in all things, act in conformity to law until the contrary is affirmatively made to appear.

WRIT OF ERROR to the Criminal Court of Cook county; the Hon. SIDNEY SMITH, Judge, presiding.

This was a proceeding for a writ of *quo warranto*. Leave was given to file an information, which was as follows:

"The State's attorney, by the authority of the people of the State of Illinois, gives the court to understand here, and be informed, that on or about the 23d day of June, 1879, John R. Walsh, Cornelius Price, Paul Cornell, John B. Sherman and Martin J. Russell, all of the county of Cook, aforesaid, without lawful warrant, and contrary to the constitution and laws of the State of Illinois, as South Park Commissioners, and claiming to act as such, did jointly and severally enter upon, intrude into, and, as such South Park Commissioners, assume jurisdiction and control over that part of the public street in the city of Chicago known as Michigan avenue, extending from the south line of Jackson street, in said city of Chicago, to the south line of Thirty-fifth street in said city, and also that part of said Thirty-fifth street extending from Michigan avenue to Grand boulevard, and thence hitherto have assumed and exercised, and still do assume and exercise jurisdiction and control over the same for boulevard and driveway purposes; that thereby the said Walsh, Price, Cornell, Sherman and Russell, as South Park Commissioners, have hitherto exercised, and still do exercise a power and authority which was not and is not conferred upon them by law; and have intruded into and unlawfully held and executed, and still do unlawfully hold and execute, a franchise, to the great damage and prejudice, and against the peace and dignity of the people aforesaid, and to the injury of the relator aforesaid.

" Wherefore, the consideration in the premises of the court is prayed, and that due process of law, returnable as soon as may be awarded against the said Walsh and others, to make them answer to the people, and show by what warrant they claim to use and enjoy the franchise aforesaid, and that thereupon they may be ousted and expelled by the judgment of the court from the franchise aforesaid; and so the State's attorney aforesaid, in the name and by the authority of the people aforesaid, says that the said Walsh, Price, Cornell, Sherman and Russell, are guilty of usurping, intruding into, unlawfully holding and executing the franchises aforesaid, contrary to the form of the statute in such case made and provided, and against the peace and dignity of the same people of the State of Illinois."

The respondents filed the following plea:

"And now, on this day, come the said John R. Walsh, Cornelius Price, Paul Cornell, John B. Sherman and Martin J. Russell, by Joseph F. Bonfield, their attorney, and having heard the said information read, protesting that the said information and the matters therein contained are not sufficient in law, to which said information the said John R. Walsh, Cornelius Price, Paul Cornell, John B. Sherman and Martin J. Russell are not, nor is either of them bound by the law of the land to answer; yet, for plea in this behalf, they say that, heretofore, under and by virtue of an act of the General Assembly of the State of Illinois, approved and in force February 24, 1869, entitled 'An act to provide for the location and maintenance of a park for the towns of South Chicago, Hyde Park and Lake,' five persons, together with their successors, were constituted a board of public park commissioners for the towns of South Chicago, Hyde Park and Lake, to be known under the name of the South Park Commissioners, and that, under the authority conferred by said act, said South Park Commissioners became duly organized, and, as such municipal corporation, have performed the corporate duties and obligations imposed on said commis-

sioners by said act, and all other acts supplementary to, or amendatory thereof.

"And these defendants, each for himself, says that they are the members of said corporation known as the South Park Commissioners, and were duly and legally appointed such, and now actually exercise the office and franchise of said commissioners, and that they have, as such commissioners, and in no other capacity, entered upon and assumed jurisdiction and control of that portion of the street known as Michigan avenue, extending from the south line of Jackson street to the south line of Thirty-fifth street, and also that portion of said Thirty-fifth street extending from Michigan avenue to Grand boulevard.

"And these defendants, each for himself, says that, under and by virtue of an act of the General Assembly of the State of Illinois, amendatory of and supplementary to an act to provide for the location and maintenance of a park for the towns of South Chicago, Hyde Park and Lake, approved and in force April 16, 1869, and also of a General Park act, entitled 'An act to enable the corporate authorities of two or more towns for park purposes, to issue bonds in renewal of bonds heretofore issued by them, and to provide for the payment of the same; to make, revise and collect a special assessment on contiguous property for benefits by reason of the location of parks and boulevards, and to make necessary changes in their location,' approved June 16, 1871, and in force July 1, 1871; and also of 'An act to enable park commissioners or corporate authorities to take, regulate, control and improve public streets leading to public parks, to pay for the improvement thereof, and in that behalf make and collect a special assessment or special tax on contiguous property,' approved and in force April 9, 1879, the powers, duties and obligations of your respondents as such South Park Commissioners were greatly enlarged, and they now, as such corporation, hold, manage and control about 1400 acres of land, including streets, avenues and driveways, for the purposes

and uses mentioned in said acts, and for which said streets, avenues and driveways were dedicated, conveyed or condemned, all of which, excepting only that part of Michigan avenue and Thirty-fifth street set forth in the information of relator, and that part of Grand boulevard north of Thirty-ninth street, lie south of the corporate limits of the city of Chicago.

"And these defendants, each for himself, says that heretofore, to-wit: On or about the 9th day of April, 1879, that part of Michigan avenue extending from the south line of Jackson street to the south line of Thirty-fifth street, and that part of Thirty-fifth street extending from the east line of Michigan avenue to the east line of Grand boulevard, were public streets within the corporate limits, jurisdiction and control of the city of Chicago, and that such parts of said streets were laid out and established at the times and in the manner following, that is to say: From Jackson street to Twelfth street. Michigan avenue falls within fractional section 15, addition to Chicago, and was dedicated as a public street by plat recorded July 20, 1836.

"After the year 1845, and prior to the year 1848, Michigan avenue, from Twelfth street to Twenty-second street, was duly and legally dedicated by the owners of lots abutting thereon. In the year 1848 Michigan avenue, from Twenty-second street to Thirty-first street, was dedicated as a public street by the trustees of the Illinois and Michigan Canal, by plat, recorded September 4, 1848, the same being sixty-six feet wide, according to said plat, and afterwards, and in the year 1869, the owners of lots abutting thereon conveyed seven feet on either side for like public uses, making the street eighty feet wide. From Thirty-first street to Thirty-second street Michigan avenue was dedicated as a street by a subdivision made by C. H. Walker in or about the year 1865. From Thirty-second street to Thirty-fifth street, Michigan avenue was dedicated as a street by subdivision made by John Wentworth, in the year 1867. Thirty-fifth street, in or about

the year 1867, was likewise dedicated to the public in subdivisions made by John Wentworth, H. O. Stone, Harriet Farlin, Francis J. Young and others.

"And these defendants, each for himself, says, that by virtue of such plats, dedications and conveyances, the fee in said part of said streets taken possession of as aforesaid by said South Park Commissioners, became vested in the public, and under the control of the people of the State of Illinois represented in the General Assembly.

"And these defendants, each for himself, says that the parts of Michigan avenue and the part of Thirty-fifth street selected and taken by them as said South Park Commissioners, are what are commonly called residence streets, the abutting property being used for residence purposes, and lie within the district or territory the property of which is taxable for the maintenance of the parks under their control as such corporate authorities, and that the consent in writing of the owners of a majority of the frontage of the lots and lands abutting on said Michigan avenue and Thirty-fifth street, so far as selected and taken as aforesaid, was first obtained as required by said act before said parts of said streets were selected and taken as aforesaid, and that said parts of said streets so taken are continuous, and necessary to form and do form one continuous improvement.

"And these defendants, each for himself, further says that on, to-wit, the 23d day of June, 1879, at a regular meeting of the city council of the city of Chicago, there being present at such meeting twenty-nine aldermen, an ordinance was passed by yeas 25 and nays 4. Said ordinance was duly approved by the mayor, and is as follows, to-wit:

" Be it ordained by the city council of the city of Chicago:

"SECTION 1. That, whereas, the General Assembly has passed a certain act which was duly approved April 9, A. D. 1879, and which, with the title thereto, is in the words and figures following:

"An act to enable park commissioners and corporate authorities to take, regulate, control and improve public streets leading to public parks, to pay for the improvement thereof, and in that behalf to make and collect a special assessment or special tax on contiguous property.

"Be it enacted by the people of the State of Illinois, represented in the General Assembly,

"§ 1.   That every board of park commissioners shall have power to connect any public park, boulevard or driveway under its control with any part of any incorporated city, town or village, by selecting and taking any connecting street or streets or part thereof, leading to such park: *Provided,* that the streets so selected and taken, so far as taken, shall be within the district or territory the property of which shall be taxable for the maintenance of such park; *and provided further,* that the consent of the corporate authorities having control of any·such street or streets, so far as selected and taken, and also the consent in writing of the owners of a majority of the frontage of the lots and lands abutting on such street or streets, so far as taken, shall be first obtained; *and provided further,* that such connection or improvement shall embrace only such street or streets as are necessary to form one continuous improvement.

"§ 2.   That such board of park commissioners or such corporate authorities as are by law authorized to levy taxes or assessments for the maintenance of such parks, shall have power to improve such street or streets in such manner as they may deem best, and for that purpose they are hereby authorized to pay for the improvement thereof, and from time to time to levy, or cause to be levied and collected, a special tax or assessment on contiguous property abutting upon such street so improved, for a sum of money not exceeding the estimated cost of such first improvement or improvements, as shall be ordered and estimated by such board of park commissioners, but not for any subsequent repair thereof.   And to that end such board of corporate

authorities shall have all the power and authority now or hereafter granted to them respectively, relative to the levy, assessment and collection of taxes and assessments for corporate purposes. And such special taxes or assessments as are hereby authorized may be divided into not exceeding four annual installments, bearing interest at the rate of six per cent per annum from the date of confirmation until paid, and the said assessment or installment thereof shall be collected and enforced in the same manner as is provided by law for the collection and enforcement of other taxes or assessments for or on account of such corporate bodies or boards, as aforesaid, so far as the same are applicable.

"§ 3.  Such park boards shall have the same power and control over the parts of streets taken under this act as are or may be by law vested in them of and concerning the parks, boulevards or driveways under their control.

"§ 4.  In case any such street, or parts thereof, shall pass from the control of any such park board, the power and authority over the same granted or authorized by this act shall revert to the proper corporate authorities of such city, town or village respectively, as aforesaid.

"§ 5.  Any city, town or village in this State shall have full power and authority to invest any of such park boards with the right to control, improve and maintain any of the streets of such city, town or village, for the purpose of carrying out the provisions of this act.

"§ 6.  Whereas, there is a necessity for the immediate construction of the improvements contemplated in this act, therefore an emergency exists, and this act shall take effect and be in force from and after its passage.  Approved April 9, 1879.

"And whereas, the Board of South Park Commissioners are about selecting and taking for the uses and purposes in the said act mentioned, that part of Michigan avenue extending from the south line of Jackson street to the south line of Thirty-fifth street, and that part of Thirty-fifth street extend-

ing from the east line of Michigan avenue to the east line of the Grand Boulevard, and the consent in writing of the owners of a majority of the frontage of the lots and lands abutting on each of the said streets, so far as taken or proposed to be taken, by said board, having been obtained, consent is hereby given and granted to the said Board of South Park Commissioners to take, regulate, control and improve the before described parts of Michigan avenue and Thirty-fifth street respectively in manner and form provided in the said act of the General Assembly. And full power and authority is hereby granted to said board of park commissioners to control, improve and maintain the parts of said streets, so to be taken as aforesaid, for the purpose of carrying out the provisions of the said act of the General Assembly: *Provided,* however, that nothing in this ordinance contained shall be construed as a waiver or relinquishment by or on the part of said city of any of its rights or powers in relation to the laying of water or gas mains and pipes, and the building and repairing of sewers in said streets, and the regulating of openings for the same. All powers which said city now has in relation to water and gas pipes, and sewers, and their connections, and the regulation of the same, and the openings for the same in streets and alleys of said city, being hereby expressly reserved as to the said part of Michigan avenue and Thirty-fifth street in as ample a manner as if the aforesaid consent were not given: *Provided,* that the estimated cost of said first improvement shall include a sum sufficient to lay a pavement of the best quality, stone curbing, a permanent sidewalk of uniform width, and such shade trees, shrubbery, additional lamp posts and other additions as may be deemed necessary to make the same in every respect a thoroughly finished boulevard.

"§ 2. Unless the said board of park commissioners shall, within thirty days from the approval hereof, select and take the said parts of streets for the purposes aforesaid, this ordinance shall cease to be of any force or effect, and the

consent given by section one aforesaid shall be deemed to be withdrawn.

"§ 3.   This ordinance shall be in force from and after its passage."

And these defendants, each for himself, says, that after the passage and approval of said ordinance, and on, to-wit, the fifteenth day of July, 1879, the said South Park Commissioners, at a regular meeting of that body, passed by an unanimous vote the following resolution:

" *Resolved,* That the Board of South Park Commissioners do hereby select and take, in accordance with the act of the General Assembly of the State of Illinois, entitled 'An act to enable park commissioners or corporate authorities to take, regulate, control and improve public streets leading to public parks, to pay for the improvement thereof, and in that behalf to make and collect a special assessment or special tax on contiguous property,' approved and in force April 9, 1879, that part of Michigan avenue extending from the south line of Jackson street to the south line of Thirty-fifth street, and that part of Thirty-fifth street extending from the east line of Michigan avenue to the east line of Grand Boulevard, in the city of Chicago, Cook county, and State of Illinois, being parts of connecting streets leading to and connecting with the South Park, the consent of the corporate authorities of the city of Chicago having been obtained, and the consent in writing of the owners of a majority of the frontage of the lands abutting on said streets, as far as taken, having been obtained as required by said act."

That the only proceedings which have been instituted or caused to be, by the said council and said commissioners, and under which said commissioners claim control or authority over said Michigan avenue and Thirty-fifth street, as heretofore set forth, have been the passage of the ordinance by the council in pursuance of the act of 1879 aforesaid, the passage of the resolution by the commissioners, and of the ordinance by the council, and the consent in writing of a majority of

16—96 ILL.

owners of the frontage, in manner and form as hereinabove detailed, and no other.

And these defendants, each for himself, says that by this warrant, and by reason of the said premises, they as such park commissioners, and not otherwise, have used and exercised for all the time in the said information in that behalf mentioned, and still do use and exercise control, authority and jurisdiction over said parts of Michigan avenue and Thirty-fifth streets, and since the passage and approval of said ordinance, and of said resolution, have claimed and do yet claim to have, use and enjoy control, authority and jurisdiction over said parts of Michigan avenue and Thirty-fifth street, as they well might and still may, for the public purposes and uses for which said parts of said streets were dedicated and conveyed, and under the authority conferred and the duties imposed upon them by law, without this, that they, the said John R. Walsh, Cornelius Price, Paul Cornell, John B. Sherman and Martin J. Russell have usurped, or do now usurp, or illegally exercise control and jurisdiction over said parts of said streets, as by said information is above supposed.

All which matters and things, they, the said John R. Walsh, Cornelius Price, Paul Cornell, John B. Sherman and Martin J. Russell, are ready to verify, as the court shall consider.

Whereupon they pray judgment, and that the aforesaid liberties, privileges and franchises in form aforesaid claimed by these defendants, may be allowed to them respectively as such South Park Commissioners, and that they may be dismissed and discharged by the court hereof and from the premises aforesaid.

There was a demurrer to the plea, but the court overruled the demurrer and sustained the plea, and the relator, electing to stand by the demurrer, refused to answer over, and the court thereupon gave judgment on the plea in favor of the respondents.

Mr. GEORGE W. SMITH, and Mr. LUTHER L. MILLS, State's attorney, for the plaintiff in error:

The charter of a municipal corporation defines its powers. It has such as are necessary to its existence and maintenance. Powers not given in express terms may be inferred, to the extent only, however, that their exercise is demanded by the necessity to preserve and effectuate the purposes of the corporation. *Springfield* v. *Edwards*, 84 Ill. 626.

The persons constituting the South Park Commissioners were created a municipality. The *Salomon case* declared that they became a *quasi* municipal authority in and for the three towns of South Chicago, Hyde Park and Lake. They were given certain powers to borrow money, to purchase, and to acquire by donation, or by condemnation, lands within specified boundaries, to be improved for and held as parks and drive-ways; to cause taxes and assessments to be levied and made, to pass ordinances or regulations, and to appoint and employ a necessary police force.

The park municipality was organized for a governmental purpose, but not for a purpose or purposes like to that, or those of a city or ordinary municipality. *Wilcox* v. *The People*, 90 Ill. 186.

A highway is a way over which the public at large have a right of passage, whether it be a carriage way, a horse way, a foot way, or a navigable river. 3 Kent, 432.

It was considered formerly, that no way which did not lead to a market town was a highway; but it is now well settled that any way common to all people, without distinction, is a highway. 1 Hawk. C. 76, sec. 1; Brand's Dic., title "Roads."

It was said by Lord COKE that there are three kinds of ways—a foot way, a pack and prime way, which is both a foot way and a horse way, and a cart way, which includes the other two. Coke's Litt. 56*a; Regina* v. *Saintiff*, 6 Mod. 255; Thompson on Highways, 1, 6 and 7.

The fee of the streets is vested in the city for the use and benefit of the public. *Canal Trustees* v. *Havens,* 11 Ill. 554; *Gebhardt* v. *Reeves,* 75 id. 301; *Helm* v. *Webster,* 85 id. 116.

All citizens of the State, equally with residents of the city, have a right to the appropriate use and enjoyment of a street. *Wright* v. *Chicago,* 69 Ill. 318, 329; *Carter* v. *Chicago,* 57 id. 283; *Chicago* v. *Rumsey,* 87 id. 348; *Moses* v. *Pittsburg, Fort Wayne and Chicago Railroad Co.* 21 id. 516; *Indianapolis, Bloomington and Western Railroad Co.* v. *Hartley,* 75 id. 74; *Lackland* v. *North Missouri Railroad Co.* 31 Mo. 180; *Dubuque* v. *Maloney,* 9 Ia. 450; *Nagle* v. *Augusta,* 5 Ga. 548.

Grounds or streets dedicated to public use must be held to the uses for which they were dedicated. For instance, a city can not escape the duty of maintaining public squares as such. *Allen* v. *Transportation Co.* 12 Ill. 60; *Jacksonville* v. *J. R. W. Co.* 67 id. 540; *Kreigh* v. *Chicago,* 86 id. 467.

Mr. JOSEPH F. BONFIELD, for the defendants in error:

The "South Park Commissioners" is a municipal corporation created under the laws of this State. *The People ex rel. Wilson* v. *Salomon,* 51 Ill. 52; *South Park Commissioners* v. *Dunlevy,* 91 id. 49.

The law-making power of the State can do any legislative act not prohibited by the constitution, and without and beyond these limitations and restrictions, it is as absolute, omnipotent and uncontrolled as parliament. *Sawyer* v. *City of Alton,* 3 Scam. 130; *The People* v. *Marshall,* 1 Gilm. 672; *Mason* v. *White,* 4 Scam. 134.

The complete title to that part of Michigan avenue and Thirty-fifth street transferred under the act of 1879, is in the public, the municipal corporation being the trustee, and the State the *cestui que trust. Moses* v. *Railroad Co.* 21 Ill. 522; *Chicago* v. *Rumsey,* 87 id. 348; *Northwestern Transportation Co.* v. *Chicago,* 99 U. S. 635.

There is no estate or legal reversion in the street in the abutter or dedicator. 2 Washburn on Real Property, (3d ed.) 687; *Nicholl* v. *New York and Erie Railroad Co.* 2 Kern. 134.

The people of the State represented in General Assembly can, at pleasure, by an appropriate act, change the trustee and transfer the control over a public street from one municipal corporation to another municipal corporation. 1 Dillon Mun. Corp. sec. 47; 2 Dillon Mun. Corp. sec. 437; *Philadelphia* v. *Fox,* 64 Pa. St. 169; *Vidal* v. *Girard's Exrs.* 2 How. 127; *Girard* v. *Philadelphia,* 7 Wallace, 1; *The People* v. *Kerr,* 37 Barb. 357–410; *Philadelphia* v. *Trenton Railroad Co.* 6 Wharton, 25.

The dedicator or abutter has no private interest in the street whatever. While its public use and character are sustained, his relation to it is simply that of any other citizen of the municipal corporation or State. *Roberts* v. *City of Chicago,* 26 Ill. 249; *Murphy* v. *City of Chicago,* 29 id. 279; *Stetson* v. *Chicago and Evanston Railroad Co.* 75 id. 74; *Peoria and Rock Island Railroad Co.* v. *Schertz,* 84 id. 135.

The rights of the abutter or dedicator become superior to those of any other citizen only when the public use fails and the property becomes again private property, or the street is so used as to amount to an eviction from or trespass upon the abutting lands, such as to constitute a " taking" or " damaging" under the constitution, as interpreted by this court. *Chicago* v. *Pacific Railroad Co.* 70 Ill. 238; *Page* v. *Chicago, Milwaukee and St. Paul Railway Co.* 70 id. 324; *Patterson* v. *Chicago, Danville and Vincennes Railway Co.* 75 id. 588.

The consent of the city of Chicago, required by the act of 1879, was given by the ordinance. The attempt to modify that consent in the ordinance was void as a reservation inconsistent with the grant. Such reservation, if valid, can only be sustained on the ground that it establishes a contract relation between the South Park Commissioners and the city of Chicago, but not as in any manner affecting the consent of

the city to the transfer. Potter's Dwarris, p. 117; *Benjamin* v. *McConnell*, 4 Gilm. 536; *Rice* v. *Webster*, 18 Ill. 331.

The exercise of control and jurisdiction over the streets in question by the South Park Commissioners, such streets being residence streets, and used for residence purposes, will not only be in keeping with their character as residence streets, but will be of great benefit to the abutting owner and the public generally.

Under the act of 1879, ample authority is given the commissioners to apply the provisions of the act of 1871, in making the contemplated improvement of Michigan avenue and Thirty-fifth street, and such special assessment proceeding, so applied, is valid. *The People* v. *Breslin*, 80 Ill. 423.

The park laws, with the exception of the act of 1879, have been declared valid enactments by this court. *The People ex rel. Wilson* v. *Salomon*, 51 Ill. 52; *The People ex rel. South Park Comrs.* v. *Williams*, 51 id. 57; *Cook* v. *South Park Comrs.* 61 id. 115; *The People* v. *Breslin*, 80 id. 423; *South Park Comrs.* v. *Dunlevy*, 91 id. 49.

The extent to which the park authorities have power to regulate the use of the streets transferred to them under the act of 1879, can not properly be considered in this case. That inquiry is not in issue here. On this subject, however, see *Indianapolis* v. *Croas*, 7 Ind. 9; *Cross* v. *Morrison*, 18 N. J. Eq. 305; *State* v. *Morrison*, 33 N. J. Law, 57; *Bell* v. *Finch*, 21 Iowa, 119; *Barrett* v. *Brooks*, 21 id. 144; 2 Dillon Mun. Corp. secs. 538, 540, 544; *Nagle* v. *Augusta*, 5 Ga. 546; *Gartside* v. *East St. Louis*, 43 Ill. 47.

Mr. FARLIN Q. BALL, also for the defendants in error.

Mr. JUSTICE SCHOLFIELD delivered the opinion of the Court:

The question here is, is it competent for the General Assembly to transfer the control of the streets of a city or village to park commissioners, to be by them controled for

boulevard and drive-way purposes? There is no other diversion of the use or control of the streets here charged, and it is not made to appear that the control and use of streets for boulevard and drive-way purposes are inconsistent with their use for the ordinary purposes of streets. The plea, indeed, distinctly avers that the relators "have claimed, and do yet claim to have, use and enjoy control, authority and jurisdiction over said parts of Michigan avenue and Thirty-fifth street, as they well might and still may, *for the public purposes and uses for which said parts of said streets were dedicated and conveyed,* and under the authority conferred and the duties imposed upon them by law."

That the park commissioners are a public municipal corporation in whom is vested certain governmental powers of a political character, is settled by the previous decisions of this court. *The People ex rel. Wilson* v. *Salomon,* 51 Ill. 37; *The People ex rel.* v. *Williams,* id. 63; *South Park Comrs.* v. *Dunlevy,* 91 id. 49.

As was said in *Wilcox* v. *The People,* 90 Ill. 192, the park commissioners "are agents by whom, in part, the people of the State carry on the government." And counsel for the relator concede that it is competent for the legislature to substitute one municipality for another in the control of streets; that it may abolish a city and appoint a successor, and that it may enlarge the powers of park commissioners and make them an ordinary municipality. Hence, it would seem, there is no objection to the vesting of the South Park Commissioners with the control of the parts of streets in question, and imposing on them the duty of improving and repairing them. Manifestly, so long as the streets are to be kept and used for the usual and ordinary uses and purposes of streets, there could be found no constitutional objection to legislation of this character. But the claim here is, that there will be a use of the streets for boulevard and drive-way purposes, which will be in violation of rights guaranteed by the constitution, because it will exclude the

usual and ordinary uses to which streets are applied. No such use is specifically charged in the information or admitted in the plea, and such a use is not an indispensable condition to the jurisdiction of the park commissioners over these streets. Will it not be quite time enough to complain of acts in excess of lawful authority when the right to practice them is avowed? Surely there can be no objection to the exercise of the powers of improving and controling streets for ordinary use and travel, merely because the right to do more than this might be claimed.

We are unable to see that the use of the streets in question for the usual purposes of streets, must necessarily be inconsistent with their improvement and use for boulevard and drive-way purposes. We can not say, as matter of law, that authority to take and use streets for these purposes implies, necessarily, authority to exclude the usual and ordinary uses of streets.

On this ground, then, alone, we might affirm the judgment below. It is not shown that the respondents are exercising or attempting to exercise a franchise, which they have usurped, in violation of law.

But, in view of the importance of the questions discussed, it is perhaps our duty to go further.

The *fee* of the streets here, is, on both sides, stated to be in the city. That is to say, the city, as the agent or representative of the public, holds the fee for the use of the public,— not the citizens of the city alone, but the entire public, of which the legislature is the representative. *Chicago* v. *Rumsey*, 87 Ill. 355.

So long as the use of the streets is not exclusive in its character, it is admitted by relator's counsel to be well settled the mode of its exercise is within the control of the legislature. Embankments for railways, tunnels for crossing streams, etc., notwithstanding they abridge the ordinary mode of use, are conceded to be within the competency of legislative authorization. But the counsel insist that the fee

here is in the city to hold in trust for the public, and that any change of the use from that within contemplation when the streets were laid out, is a perversion of the trust and beyond legislative power, and *Jacksonville .v. J. Ry. Co.* 67 Ill. 540, *Carter* v. *Chicago,* 57 id. 283, and *City of Alton* v. *Transportation Co.* 12 id. 38, are cited in support of the position.

None of these cases are analogous to the present.

In the first named case, bill was filed by the city to enjoin the railway company from "laying down its track over the public park. No consent for that purpose was given by the city or the adjacent property holders.

The next case was a bill in chancery, by a property owner, to enjoin the city from carrying into effect a certain ordinance with reference to a portion of Franklin street, and the question related purely to the private rights of the complainant.

The other case was a contest between the city and a private corporation with regard to the ownership of certain property.

In neither case was there any question of the competency of the legislature, in the case of a purely public trust, unaffected by private rights, to change the use to which the trust was devoted.

In the present case, the legislature has conferred the authority to change the use. The city has acted pursuant to the authority and given its consent, and no private individual interposes objection. The case is purely public, and relates only to the public interest.

In cases of property dedicated to public uses there are, most usually, two classes of interests affected, one that of the public generally, and the other that of private parties.

For any change of such a use, since the adoption of our present constitution, there can hardly be any doubt but that, to the extent it damages the private individual, he is entitled to recover. But he may waive this right if he chooses. If he does not sue, it concerns neither other individuals nor the public at large. They can not litigate for him, either in his

own name, or in the name of the public. This is so elementary and obvious that it needs no reference to authorities.

But the legislature represents the public. So far as concerns the public, it may authorize one use to-day and another and different use to-morrow. If the new use affects private rights, proceedings for condemnation may have to be invoked, but so far as it affects the public alone, its representative, in the absence of constitutional restraint, may do as it pleases.

In *The People* v. *Kerr*, 27 N. Y. 188, the proceeding was to enjoin digging up and perverting the soil for the purpose of laying and operating a railroad, and to enjoin the defendants, the mayor, aldermen, etc., from giving their assent to such acts, etc. The court, among other things, said: " So far as the existing public rights in these streets are concerned, such as the right of passage and travel over them as common highways, a little reflection will show that the legislature has supreme control over them. When no private interests are involved or invaded, the legislature may close a highway and relinquish altogether its use by the public, or it may regulate such use or restrict it to peculiar vehicles, or to the use of particular motive power. It may change one kind of use into another, so long as the property continues devoted to public use. What belongs to the public may be controled and disposed of in any way which the public agent sees fit."

In *Moses et al.* v. *Pittsburg, Fort Wayne and Chicago R. R. Co.* 21 Ill. 516, the suit was against the railroad company, by a private property holder, to enjoin the building and operating of a railroad in the street. The injunction was refused, the court saying: " A street is made for the passage of persons and property, and the law can not define what exclusive means of transportation and passage shall be used. Universal experience shows that this can best be left to the determination of the municipal authorities, who are supposed to be best acquainted with the wants and necessities of the citizens generally."

In *Murphy* v. *Chicago*, 29 Ill. 279, and other kindred cases, decided before the adoption of the present constitution, it was held that it was a legitimate use of a street to allow a railroad to be constructed and operated within it, and even where private property holders were injured thereby, there could be no recovery.

In *Chicago* v. *Rumsey*, 87 Ill. 348, we held that it was a legitimate use of a street to allow a tunnel to be constructed in it.

The laying of railroad tracks and the making of the necessary excavations and embankments therefor, and the making of a tunnel in a street, in many instances practically destroy streets for the ordinary street purposes, and in all cases they materially contract and abridge the use of the street for the ordinary purposes of streets.

But what is the difference between the power to abridge and contract a use and the power to change it? Neither is consistent with the continued right in the public to have a street perpetually remain in the identical use to which it is at first dedicated.

The principle controling, as we have seen, is, "when no private interests are involved or invaded, the legislature may close a highway or street and relinquish altogether its use by the public, or it may regulate such use or restrict it."

Dillon, in his work on Municipal Corporations, (1st ed.) § 527, says: "The plenary power of the legislature over streets and highways is such that it may, in the absence of special constitutional restriction, vacate or discontinue them, or invest municipal corporations with this authority."

And in the same volume, in § 519, he again says: "As respects the public or municipalities, there is no limit upon the power of the legislature as to the uses to which streets may be devoted."

See, also, *Gray* v. *Iowa Land Co.* 26 Iowa, 387; *McDonald* v. *English*, 85 Ill. 235; *Galesburg* v. *Hawkinson*, 75 id. 156.

Even where private parties are invested with a franchise to build and control a toll bridge or toll road, the legislature may authorize the ,franchise to be taken and condemned for public use, upon making just compensation. *West River Bridge Co.* v. *Dix*, 6 Howard, 507,—*a fortiori* can public property be taken which is held for one use and appropriated to another and different use.

The private rights or interests in public property can not, of course, be taken without compensation to be made pursuant to law.

But " every species of property which may become necessary for the public use, and which the government can not appropriate under any other recognized right, is subject to be seized and appropriated under the right of eminent domain." Cooley's Const. Limitations, (1st ed.) 526.

We are not authorized to assume, in this proceeding, that the park commissioners will undertake to divest private rights and appropriate them to public use without making satisfactory compensation, or proceeding to condemn them under the law relating to eminent domain.

To authorize a judgment of ouster, it is essential that it be established, as respects the streets in controversy, that the park commissioners are usurpers and intruders, and hence that their every act is in violation of law. If they may, by any legal steps or process, make the diversion complained of, the judgment below is right, because we are to assume they will, in all things, act in conformity with law, until the contrary is affirmatively made to appear.

In *Kreigh* v. *Chicago*, 86 Ill. 407, we held no power existed in the city to alienate the control of its streets to the park commissioners, and that the thirty-eighth section of chapter 105 of the Revised Statutes of 1874, entitled Parks, authorizing the connecting of contiguous parks by boulevards or pleasure-ways, and putting such boulevards or pleasure-ways under the control of park commissioners, etc., had no reference to prior established streets, and did not authorize the

park commissioners to purchase or acquire established streets, nor the city authorities to surrender control over them. But, in the present case, the needed legislation is supplied. What was there held to be wanting, we have here; and the question is not, have the commissioners and the city the power under the statute, but was it competent for the legislature to enact the statute conferring the power upon the city and the park commissioners.

In the ordinance of the city granting to the park commissioners the use and control of the parts of streets in controversy, there is this reservation: "*Provided,* however, that nothing in this ordinance contained shall be construed as a waiver or relinquishment by or on the part of said city, of any of its rights or powers in relation to the laying of water or gas mains and pipes, and the building and repairing of sewers, in said streets, and the regulating of openings for the same; all powers which said city now has in relation to water and gas pipes and sewers, and their connections and the regulation of the same, and the openings for the same, in streets and alleys of said city, being hereby expressly reserved as to the said part of Michigan avenue and Thirty-fifth street in as ample a manner as if the aforesaid consent was not given."

Counsel for relators make the point on this, that "the control contemplated by the act of 1879 is an individual control;" that "an absolute control is necessary, in order to the execution of the powers of the commissioners, and is inconsistent with a partial control by the city." They argue: "The question here is, has the council assented. It had the grant of powers so to do, but might or not, as it should choose; it was under no moral or legal obligation. The whole ordinance read together shows that it did not assent in the manner contemplated or authorized."

It is not attempted to be shown why an absolute control is necessary in order to the execution of the powers of the commissioners. It is asserted that this necessity is inconsistent

with a partial control by the city, and if the necessity be conceded, the conclusion would clearly be correct. But why may not the main objects and purposes of the grant to the park commissioners be entirely consistent with the exercise of the reserved powers in the city?

The laying of water or gas mains and pipes, and the building and repairing of sewers, would have to be so done as to interfere as little as possible with the use of the streets; and it approximates accuracy sufficiently for all practical purposes, to say that, when so done, they would not materially interfere with the use of the streets. Some inconvenience would, doubtless, occasionally result, by reason of disagreement between the city council and the park commissioners as to systems of sewerage, but in such case the park commissioners would simply have to yield—they take the grant *cum onere.*

The act of April 9, 1879, does not make it obligatory upon the city to confer control over the streets upon the park commissioners. It only enables them to do so or not as they shall choose. The corporate authorities having control of any such streets, must first give their consent. They are at liberty to entirely withhold it, or grant it only subject to conditions. If the park commissioners accept it with conditions, the performance of the conditions then becomes obligatory.

There is no more apparent repugnancy between the grant and the reservation here than there is between a lease of lands for farming purposes and the reservation of the right to take timber or gravel, etc., from the land, or to travel across it, or use water from springs thereon, or to excavate and mine for coal or other minerals beneath its surface.

The grant is merely charged with the burden of the reservation. The rights of each may be enjoyed without necessary conflict.

Upon the whole, we think the judgment below to be right. The mere fact that the park commissioners may claim the right to do some act prejudicial to the interests of individuals, furnishes no reason why they may not, as affects the

public, do those acts which are clearly sanctioned by law. If they may, as respects the control and improvement of these streets in some respects, act as a corporation, they have a franchise, and can not be declared usurpers and intruders merely because in other respects that they might claim the right to act they would exceed the authority vested in them by law.

Intrusion or usurpation, and trespass, are not synonymous terms.

As respects any excess of authority, the action of the commissioners may be controled by injunction; and they may be held individually responsible in actions by those who are pecuniarily injured; and, in proper cases, they may be liable to criminal prosecutions.

But this proceeding merely questions their right to act at all within, and not without, the scope of statutory authority.

The judgment is affirmed.

*Judgment affirmed.*